# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ERIN MOSLEY, *et al.*,

        Plaintiffs,

                                     Civil Action 2:16-cv-01197
                                     Judge Michael H. Watson
      v.                               Chief Magistrate Judge Elizabeth P. Deavers

SPARTAN FREIGHT SYSTEMS, INC., *et al.*,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Sanctions Against 9052-9025 Quebec, Inc., VTL V-Trans Ltd., and VTL Transport (ECF No. 77), Defendants 9052-9025 Quebec Inc., VTL V-Trans Ltd., and VTL Transport's Brief in Opposition (ECF No. 81), and Plaintiffs' Reply in Support (ECF No. 82.) This matter was referred to the Undersigned by an Order of District Judge Michael H. Watson. (ECF No. 134.)[1] For the reasons that follow, Plaintiffs' Motion is **GRANTED**. (ECF No. 77.)

### I. BACKGROUND

Plaintiffs filed their original Complaint on December 22, 2016. (ECF No. 1.) They filed an Amended Complaint on June 20, 2017 (ECF No. 25) and a Second Amended Complaint on August 31, 2017. (ECF No. 37.) Plaintiffs then filed a Third Amended Complaint on March 2, 2018 (ECF No. 64) and a Fourth Amended Complaint on July 30, 2018. (ECF No. 96.) The

---

[1] Under the provisions of General Order COL: 14-01, § IV.C.1, the Undersigned has authority to dispose of this Motion without a formal reference.

only Defendants involved in Plaintiffs' Motion for Sanctions are 9052-9025 Quebec, Inc., VTL V-Trans Ltd., and VTL Transport (collectively, "Defendants" or "VTL Defendants"). Defendants filed their Answer to Plaintiffs' Fourth Amended Complaint on September 24, 2018. (ECF No. 117.) Plaintiffs allege that P.H. Glatfelter Company, a paper products manufacturer, contracted with Defendants to ship a load of paper from a plant in Chillicothe, Ohio to a customer in Toronto. (ECF No. 96, at pg. 3.) Plaintiffs further allege that Defendants sub-contracted the load to Spartan Freight Systems, Inc. for transport. (*Id.*) The semi-tractor trailer carrying the load was involved in a car crash with the Plaintiffs' Chevy Traverse. (*Id.*) Two passengers in the Chevy Traverse, Plaintiffs' two young children, died from injuries sustained in the crash. (*Id.* at pg. 3–4.)

Plaintiffs filed the Motion for Sanctions against the above-specified Defendants on May 8, 2018. (ECF No. 77.) An evidentiary hearing on the Motion was scheduled before District Judge Michael H. Watson for October 2, 2018. (ECF No. 100.) He subsequently vacated the evidentiary hearing on September 28, 2018. On November 9, 2018, the Motion was referred to the Undersigned. (ECF No. 134.) The Court then scheduled and conducted an evidentiary hearing on January 8, 2019. The parties filed no additional briefing on the Motion. Plaintiffs seek any sanctions the Court deems appropriate under Federal Rules of Civil Procedure Rule 37(b)(2)(A)(i)-(vii). (ECF No. 77, at pg. 3.) Plaintiffs bring the Motion for Sanctions against Defendants based on the following allegations:

> Failure to provide discovery pursuant to the December 1, 2017 Order of this Court, in which the VTL Defendants were directed to verify whether they carry any excess insurance, but then improperly denied any excess coverage existed in their December 18, 2017 discovery responses. This denial was despite the VTL Defendants having filed a claim under their umbrella policy specifically for the fatal crash at issue in this litigation approximately six months earlier;

Failure to disclose an umbrella insurance policy that applies to the claims herein until April 10, 2018, despite counsel for Plaintiffs' specific deposition questions and discovery requests requesting information on all insurance coverage months ago;

Failure to supplement discovery responses related to insurance coverage; and

Failure to provide a copy of the policy, declarations pages and all relevant documents related to the umbrella policy.

(*Id.* at pg. 1–2.)

## II. FACTS

Plaintiffs ask the Court to impose sanctions for the following actions of Defendants:

- Failure to provide discovery pursuant to the December 1, 2017 Order of this Court;

- Failure to disclose an umbrella insurance policy;

- Failure to supplement discovery responses related to insurance coverage;

- Failure to provide a copy of the policy, declarations pages and all relevant documents related to the umbrella policy.

(ECF No. 77, at pg. 1–2.)[2]  The December 1, 2017 Order of this Court provides in pertinent part:

Plaintiffs and Defendant VTL Transport and associated Defendants disagree as to the production of applicable insurance contracts.  Plaintiffs maintain that Defendants have directed them to standardized policies available online, together with the appropriate declarations page from the operative insurance contract, but have not provided a copy of the actual insurance policy.  Defendants maintain that they have complied with their obligations to produce, and further understand that in Canada, where the policy was issued and insurance laws differ from the United States, the dec page and standardized policy constitute the insurance contract.  Because the Court understands the declaration page of an insurance contract merely to summarize the pertinent terms of the underlying policy, the Court directed

_____

[2] Plaintiffs also requested that this Court order the VTL Defendants to provide Plaintiffs with a copy of the umbrella policy and June 2017 claim against the policy.  (ECF No. 77, at pg. 3.) Defendants, however, have since represented to the Court that they provided Plaintiffs with a copy of the excess policy on May 11, 2018, and then provided a certified copy of the excess policy on May 14, 2018.  (ECF No. 81, at pg. 1.)

Defendants to again ensure that no other operative documents are responsive to Plaintiffs' request. Similarly, *Defendants' counsel will confer with his clients to verify whether they carry any excess insurance that would be at issue in this litigation.*

(ECF No. 44) (emphasis added). On December 4, 2017, counsel for Defendants emailed counsel for Plaintiffs the requested copies of the insurance policies, but no excess or umbrella policies. (ECF No. 77, Exhibit 3.) As discussed more fully below, Plaintiffs eventually discovered a Lloyds of London umbrella policy after years of asking for it. They also learned there was an open claim for the Mosley accident that had been filed months before.

On or about December 11, 2017, Defendants provided Plaintiffs with their responses to Plaintiffs' Revised Request for Admissions. (*Id.*, Exhibit 5.) Plaintiffs made the following request for admission:

> Admit that on September 16, 2016 you had no insurance coverage that would apply to any claims related to any load that was being transported by a subcontractor.

(*Id.*, Exhibit 5, at No. 10.) Defendants' response provided:

> Deny.
>
> As of September 16, 2016, VTL V-Trans Ltd., VTL Transport and 9052-9025 Quebec, Inc. were insured by Economical Insurance for Contingent Motor Carrier Cargo Liability and this coverage was included with the Economical Insurance policy.
>
> This coverage applies only pursuant to the specific wording of the Contingent Cargo Liability Coverage Extension Form (attached).

(*Id.*) Furthermore, counsel for Plaintiffs sent multiple emails regarding insurance discovery issues to counsel for Defendants spanning a one-year period. (*Id.*, Exhibit 6.) The Court construes each of these emails to invite an opportunity for Defendants to provide additional insurance information that became known to them at any point.

Counsel for Plaintiffs conducted Rule 30(b)(6) depositions under the Federal Rules of

Civil Procedure of Defendant 9052-9025 Quebec, Inc., requesting those who were to testify to be

fully prepared to testify regarding all information that is known or reasonably available to 9052-

9025 Quebec, Inc.'s organization regarding a number of designated matters, specifically

including the following:

## B. INSURANCE ISSUES

8. The identity, job title and duties of all persons who had the authority to purchase and bind insurance coverage, obtain quotes for insurance, and vet insurance quotes for coverage for 9052-9025 Quebec, Inc. and any related entity from 2013 to the present time,

    a)   Including insurance for:

            15)      VTL Transport
            16)      VTL V-Trans
            17)      VTL V-Trans, Ltd.
            18)      7329385 Canada, Inc.
            19)      Spartan Freight Systems, Inc.
            20)      P.H. Glatfelter Co.

(*Id.*, Exhibit 7.)  Plaintiffs deposed Larry Burn, President of the VTL Defendant companies, on

December 13, 2017.  (*Id.*, Exhibit 8 ["Burn Depo."] (an excerpted transcript of the deposition);

ECF No. 91, at pg. 1, 16 ["Full Burn Depo."] (a full transcript of the deposition).)

Defendants' counsel stated on the record at the Deposition of Larry Burn that Mr. Burn

was not produced to respond to questions about insurance:

Q. And as it relates to the notice of deposition for the corporate representative, you haven't been produced specifically to talk about all of the safety issues related to VTL.  Is that correct?

MR. BELZER [Defendants' counsel]: That's incorrect.  He is the representative for everything except for the insurance issues where Lucie was produced.

Burn Depo. at pg. 4; Full Burn Depo. at pg. 196.  Plaintiffs also deposed Lucie Bourbeau, CFO

of the VTL Defendant companies, on December 13, 2017.  (ECF No. 77, Exhibit 9 ["Bourbeau

Depo."] (an excerpted transcript of the deposition); ECF No. 121 ["Full Bourbeau Depo."] (a full transcript of the deposition).)  Despite being produced as the 30(b)(6) corporate representative for the VTL Defendants regarding insurance, Ms. Bourbeau demonstrated that she was underprepared for the deposition and that she lacked an understanding about basic insurance issues.  The following excerpt of her deposition testimony serves as an example:

Q. Okay.  What did you do in preparation for your testimony today as a corporate representative?

A. I met Mr. Belzer and basically we spoke about - -

. . .

Q. I don't want to know the substance of what you talked with Mr. Belzer about.  I just want to know what else did you do other than conferring with Mr. Belzer?  Did you look at documents?  Did you interview any people?

A. No.

Q. Do I understand - - did you look at the notice of deposition?

A. What notice of deposition?

Q. Okay.  Do you know what areas you are going - - you have been produced to testify about?

A. For this case?

Q. Yes.

A. Yes.

Q. What areas?

A. I know I have to do a deposition for the file that has to do with Spartan carrier.

Q. Okay.  Do you know what insurance coverage applies to the claim that involves the Mosley family?

A. I don't understand the question.   By "coverage" do you mean the type of insurance?

Q. Yes, type of insurance.

A. I don't really understand the question. I don't know what you mean by type of insurance.

. . .

Q. Do you have any training in insurance coverage?

A. No.

. . .

Q. Is it your understanding when you purchase insurance that it would apply to accidents that involve a subcontracted carrier?

A. There is a coverage that covers that.

Q. And do you know specifically what policy would cover that?

A. I couldn't say specifically, but I know we are covered for that.

Q. How do you know you are covered for that?

A. Because we have a brokerage company and we have to be covered for that activity.

. . .

Q. Okay. Do you know what excess insurance coverage is?

A. No. I would have to get more information.

(Full Bourbeau Depo., at pg. 7–9, 11–12.)

Furthermore, Ms. Bourbeau provided inaccurate information regarding the existence of the excess umbrella insurance policy at issue in Plaintiffs' Motion for Sanctions. Specifically, Ms. Bourbeau testified that the only insurance coverage was provided by Economical Insurance Company, but neglected to mention the Lloyds of London umbrella policy which was in existence at the time:

Q. Who are the insurance carriers that provided coverage in September of 2016 to VTL or any related entity?

A. So in 2016 the broker was Univesta and the insurance was Economical.

(Full Bourbeau Depo., at pg. 13.)

Ms. Bourbeau also testified at the evidentiary hearing. When Plaintiffs' counsel questioned her as to why she did not provide information regarding the Lloyds of London policy, Ms. Bourbeau repeatedly stated she simply was not aware of the policy. (Tr. at 10, 14.) Ms. Bourbeau further testified that she knew before the deposition that she would have to answer questions regarding insurance coverage, despite that fact she admitted that she did not review any documents or information in preparation for the deposition. (*Id.* at 11–12.) Rather, Ms. Bourbeau testified that her only preparation was meeting with Defendants' counsel, Mr. Belzer, for maybe ten or fifteen minutes. (*Id.* at 12.) Furthermore, Plaintiffs' counsel pointed out to Ms. Bourbeau that in a June 5, 2017 email she sent to Claudine Carbonneau of Univesta, an insurance brokerage company for the VTL Defendants, who was VTL's agent of record, one of the attachments included referenced the Lloyds of London policy. (*Id.* at 14–16, 18.) Ms. Bourbeau testified that perhaps she knew about the Lloyds of London policy at one time and forgot later, but that she never tried to lie or hide, she simply made a mistake. (*Id.* at 18.)

Mr. Burn, in his deposition testimony, also provided inaccurate information when he was directly asked whether the VTL Defendants had an umbrella or an excess policy:

Q. Okay. Did VTL have an excess policy in place in 2015?

A. An excess?

Q. An excess policy through Zurich Insurance Company?

A. I am not aware.

Q. Do you know what an excess policy is?

A. Sort of like an umbrella coverage.

Q. Yes.

A. I don't think so.

Q. Have you ever had an umbrella coverage or an excess coverage?

A. I don't think so, no.

(Full Burn Depo., at pg. 223.)[3]  Furthermore, in an Affidavit from Mr. Burn prepared in Response to the instant Motion, Mr. Burn acknowledges that he failed to check with VTL's insurance broker—or anyone else—regarding whether the VTL Defendants had an excess or umbrella insurance policy.  (ECF No. 81, Exhibit 3 at ¶ 5 ["Burn Aff."].)  Mr. Burn states that he simply "relied upon the information provided to [him] by [his] staff."  (*Id.*)

Indeed, Mr. Burn testified at the evidentiary hearing that when he initially received notice about the above-captioned case, he did not review the insurance that might apply.  (Tr. at 42.)  Instead, Mr. Burn testified that he only relied on Ms. Bourbeau, but he never asked her what insurance coverage the companies had or for the documents that showed what insurance the companies had.  (*Id.* at 44–45.)

Furthermore, during the evidentiary hearing, Plaintiffs' counsel pointed out to Mr. Burn that he had been copied on the June 5, 2017 email that Ms. Bourbeau sent to Ms. Carbonneau that included an attachment referencing the Lloyds of London Policy.  (*Id.* at 45–46.)  Mr. Burn testified that he did not open the attachments.  (*Id.* at 46.)  When Mr. Burn was asked by

---

[3] After this exchange, Defendants' counsel then objected to this line of questioning, arguing that Ms. Bourbeau was the witness designated for insurance questions, not Mr. Burn.  Plaintiffs' counsel points out, however, that Ms. Bourbeau testified in her deposition that both she and Mr. Burn are involved in the purchase and procurement of insurance.  (Full Burn Depo., at pg. 223–24; Full Bourbeau Depo., at pg. 9.)

Plaintiffs' counsel whether he knew that it was his responsibility as the CEO to provide full and adequate responses, Mr. Burn answered affirmatively but that he delegated it to his staff members. (*Id.* at 48–49.) Plaintiffs' counsel also inquired of Mr. Burn that in the errata sheet for his deposition, provided five days after his deposition on December 18, 2017, Mr. Burn admitted there was a Zurich Insurance policy. (*Id.* at 51.) When asked how he obtained this information, Mr. Burn said he could not remember and that the writing on the errata sheet was not his own. (*Id.* at 51–53.) Mr. Burn later testified though that the person who filled out the errata sheet would have discussed the corrections with him before doing so, and that such a conversation might have occurred but he simply forgot it happened. (*Id.* at 59–60.)

For his part, Defendants' counsel indicates in his Affidavit that he undertook the following actions regarding attempts to provide proper discovery to Plaintiffs:

> Without waiving attorney-client privilege, I met with VTL in person to discuss Plaintiffs' discovery requests on May 11, 2017 and had multiple discussions with VTL to confirm its responses prior to submitting VTL's answers on June 9, 2017.

> Prior to December 1, 2017 I received documents from Economical Insurance which Economical asserted was a certified copy of VTL's insurance policy and that those documents were produced to Plaintiffs with the undersigned's understanding that those documents represented the entirety of what could be considered VTL's insurance policy.

> Without waiving attorney-client privilege, I complied with the entirety of this Court's December 1, 2017 Order. I requested that VTL check again to see whether it had an excess policy. The issue was then addressed at the 30(b)(6) deposition of VTL's CFO, Lucie Boubeau, who stated that VTL's policy responsive insurance was limited to the Economical Insurance Policy.

> In addition, as part of my compliance with the Court's December 1, 2017 Order I obtained additional documents that could be considered part of Economical's insurance policy with VTL and provided those documents to all parties.

> . . .

> On April 9, 2018, Plaintiffs counsel informed me of his belief that documents produced by VTL indicated VTL had an excess/umbrella insurance policy at the

time of the events giving rise to suit.  I indicated to Plaintiffs' counsel that this was the "first I heard of it" and I would check and get back to him. . . .

In my capacity as counsel of record for VTL, I communicated with counsel for Plaintiffs by both email and telephone on April 10, 2018 to discuss that I learned on April 10, 2018 that VTL had excess coverage in effect at the time of the events giving rise to suit.

On that date Plaintiffs requested a copy of the excess policy.  Within an hour of that discussion, I communicated that request to VTL's excess insurer and was told the policy would be provided.

[I received emails] from VTL's excess carrier on May 11, 2018, including the excess policy and all correspondence relating to the policy.

On May 11, 2018, I provided copies of [the emails] to all counsel of record via e-mail.

On May 14, 2018, VTL's excess insurer provided me with a certified copy of its excess policy.  I provided copies of that policy to Plaintiffs' counsel on May 14, 2018.

(ECF No. 81, Exhibit 2, Affidavit of Geoffrey A. Belzer, at ¶¶ 4–7, 11–16 ["Belzer Aff."].)

Plaintiffs represent that they first discovered the existence of the Lloyds of London policy when Defendants responded to Plaintiffs' Second Request for Production of Documents on March 26, 2018.  (ECF No. 77, at pg. 7.)  Plaintiffs explain that Defendants produced "thousands of pages of documents" but failed to disclose that one of the documents produced was the cover page (written in French) for insurance policy No. 155546, issued by Lloyds of London which appeared to be in effect when the car crash at issue in the above-captioned case occurred.  (*Id.*; ECF No. 77, Exhibit 10.)  Defendants also produced in their response to Plaintiffs' Second Request for Production of Documents on March 26, 2018 paperwork demonstrating that the VTL Defendants paid over $23,500 CAD[4] for that umbrella policy coverage.  (ECF No. 77, Exhibit 11.)

---

[4] Canadian Dollars.

Upon discovering this information, Plaintiffs' counsel "immediately emailed counsel for the VTL Defendants for clarification." (ECF No. 77, Exhibit 12.) The email exchange reads as follows:

> From Plaintiffs' counsel on April 9, 2018 at 6:53 AM: Geoffrey, Looks like there is a Lloyds of London umbrella policy.

> From Defendants' counsel on April 9, 2018 at 8:13 AM: I will check on it. First I've heart of it. Geoff

> From Defendants' counsel on April 10, 2018 at 12:28 PM: Tom, I have confirmed that there is an umbrella policy and an open claim. I am glad to discuss further. Please let me know when you want to talk. Thanks! Geoff

(*Id.*) Plaintiffs learned that "the VTL Defendants did in fact have a $5,000,000 umbrella coverage policy issued by Lloyds of London on June 27, 2016, and effective until June 27, 2017." (ECF No. 77, at pg. 7.) Notably, Defendants "confirmed that there was coverage and that *a claim for the Mosley Crash had been opened in June 2017*." (*Id.*) (emphasis added); ECF No. 77, Exhibit 13, at ¶ 3 ["Robenalt Aff."].) Defendants did not provide Plaintiffs with a copy of the Lloyds of London policy until May 11, 2018, three days after the instant Motion had been filed. (ECF No. 81, at pg. 1.)

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 37(b)(2) sets forth a laundry list of sanctions that a court may impose when a party fails to comply with its discovery orders. Fed. R. Civ. P. 37(b)(2). Rule 37(b)(2)(A) provides:

> (A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)— fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).

Under the provisions of Rule 37(b)(2)(C), "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). Rule 37(c) adds that a court may order payment of the reasonable expenses, including attorney's fees, if a party fails to disclose certain information or fails to supplement an earlier response. Fed. R. Civ. P. 37(c). In determining an appropriate sanction under Rule 37, "a court may properly consider both punishment and deterrence." *JPMorgan Chase Bank, N.A. v. Neovi, Inc.*, No. 2:06-cv-0095, 2007 WL 1989752, at *4 (S.D. Ohio July 9, 2007). "The burden of proof is on the sanctioned party to establish that its failure to comply was due to inability and not to willfulness, bad faith, or any fault of the party." *Id.* (internal quotations and citation omitted). Furthermore, "[f]ault, in this context, includes gross negligence." *Id.* (citation omitted). A court has wide discretion in determining an appropriate sanction under Rule 37. *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976).

# IV. ANALYSIS

The record is clear that Defendants have failed to comply with this Court's December 1, 2017 Order and have failed to meet their discovery obligations. Indeed, Defendants do not argue to the contrary regarding their inaccurate responses to Plaintiffs' discovery requests.[5] (*See* ECF No. 81, at pg. 1 (Defendants note that they "do **not** dispute that their responses to Plaintiffs' discovery requests regarding whether it had an excess policy, and their answers at deposition on that issue, were incorrect.") (emphasis in original).) The only issue then is whether sanctions are appropriate, and if so, which specific sanctions. Under the totality of the circumstances here, the Court finds that sanctions are appropriate. Defendants were supposedly unaware that the Lloyds of London insurance policy existed despite making a claim on the policy for the car crash involving the Mosleys.[6] But, ignorance, without diligence, is not an acceptable excuse. The best-case scenario is that Defendants simply did not make any attempt to determine all the insurance policies they had, despite their representations and Plaintiffs' repeated attempts at obtaining this information. The worst-case scenario is that Defendants caused Plaintiffs to endure the unreasonable wait knowing all along that they had the Lloyds of London insurance policy. While the Court is inclined to accept the former as true, either way, Defendants committed a sanctionable discovery violation.

---

[5] Defendants claim that the Affidavits of Geoffrey Belzer (counsel for Defendants) and Larry Burn "establish that VTL fully complied with the Court's December 1, 2017 Order." (ECF No. 81, at pg. 4.) Neither Affidavit does as Defendants claim. Rather, the Affiants insinuate that Defendants were simply unaware of the excess policy, and for this reason, they did not provide it despite the explicit Order from the Court to investigate further. (ECF No. 81, Exhibit 2, at ¶ 6 & Exhibit 3, at ¶ 6.) Ignorance on the part of Defendants does not equate to compliance.

[6] Indeed, the Plaintiffs explain this conundrum precisely: "The VTL Defendants were aware enough of the umbrella policy to have made a claim with Lloyd's of London after the Mosley Crash, so to claim the umbrella policy is somehow newly-discovered in April 2018 is difficult to comprehend." (ECF No. 77, at pg. 11.)

Defendants attempt to explain away the claim regarding the Mosley crash on the Lloyd's of London policy by blaming Ms. Carbonneau of Univesta. (*See* ECF No. 81, at pg. 3.) Defendants posit that Ms. Carbonneau, based on correspondence with VTL's primary insurer, Economical, sent an email on June 6, 2017 to VTL's excess insurer, Markel, "putting the excess carrier on notice of a potential claim against the excess policy" but "without providing a 'cc' copy to anyone at VTL." (*Id.*; ECF No. 81, Exhibit 4, at ¶¶ 16–18.) Defendants further posit that Ms. Carbonneau "did not discuss the notice to Markel with Mr. Burn or VTL's CFO, Lucie Bourbeau." (*Id.* at ¶ 20.) However, Defendants go on to declare that Ms. Carbonneau "*had full authority to place Markel on notice without receiving specific consent from VTL to do so*." (ECF No. 81, at pg. 3 (emphasis added); ECF No. 81, Exhibit 4, at ¶ 19.) For Defendants to claim it is acceptable that Ms. Carbonneau would have "full authority" and "specific consent from VTL" to place Markel on notice, but at the same time VTL could remain ignorant of the fact that the excess insurance policy even existed, *and* not even bother to inquire of Ms. Carbonneau, is sanctionable. The court in *Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2014 WL 2987051, at *18 (S.D. Ohio July 1, 2014), *adopted as modified*, No. 2:11-cv-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) is instructive:

> One can only guess at why [defendant] was apparently unable or unwilling to ask the right people the right questions . . . . Perhaps the people [defendant] charged with interacting with counsel in this case so misunderstood [the situation] that they did not think to investigate it further; perhaps they knew the truth all along but feared that the information would help [plaintiffs] and hurt [defendant]. The end result is the same, however. [Plaintiffs] did not get this discovery timely; they were forced, unnecessarily, to spend time and money trying to resolve the matter informally, with the Court, and eventually, by way of motions practice . . . . But it is not fair to place the entire blame on [defendant], even if it must shoulder the ultimate responsibility for not telling counsel what, collectively, it knew or should have known to be the truth . . . . [C]ounsel cannot simply take a client's representations about such matters at face value. After all, Rule 26(g) requires counsel to sign discovery responses and to certify their accuracy based on "a

reasonable inquiry" into the facts. [As the court explained in *Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 461 (S.D. Ohio Dec. 11, 1995):]

> The Court expects that any trial attorney appearing as counsel of record in this Court who receives a request for production of documents in a case such as this will formulate a plan of action which will ensure full and fair compliance with the request. Such a plan would include communicating with the client to identify the persons having responsibility for the matters which are the subject of the discovery request and all employees likely to have been the authors, recipients or custodians of documents falling within the request. The plan should ensure that all such individuals are contacted and interviewed regarding their knowledge of the existence of any documents covered by the discovery request, and should include steps to ensure that all documents within their knowledge are retrieved. *All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved* or the existence of other individuals who might have documents, and there should be appropriate follow up. Of course, the details of an appropriate document search will vary, depending upon the circumstances of the particular case, but in the abstract the Court believes these basic procedures should be employed by any careful and conscientious lawyer in every case.

*Id.* (emphasis added). If Defendants, specifically Mr. Burn or Ms. Bourbeau, had only "ask[ed] the right people the right questions" regarding excess insurance the Court would not be tasked with resolving the instant Motion. Furthermore, if Defendants counsel had perused the documents provided to Plaintiffs that contained the Lloyd's of London policy cover page, counsel himself should have recognized that a deeper inquiry into Defendants' insurance was necessitated.[7]

A litigant "is prejudiced by a [party's] dilatory conduct if the [litigant] is required to waste time, money, and effort in pursuit of cooperation which [the party] was legally obligated to provide." *Carpenter v. City of Flint*, 723 F.3d 700, 707 (6th Cir. 2013) (internal quotations and

---

[7] Specifically regarding the cover page amidst a mass of documents, Defendants offer that "VTL's counsel did not, at the time the production occurred, recognize the importance of these documents." (ECF No. 81, at pg. 5.) As the Court has explained above, ignorance without diligence does not equate to compliance.

citation omitted). Furthermore, even if the litigant ultimately receives the sought-after documents this "ignores the fact that the [litigant was] required to expend time, money, and effort, to compel the production of these documents that [the party] was legally obligated to provide in the first place." *Brown v. Tellermate Holdings, Ltd.*, 2:11-cv-1122, 2015 WL 4742686, *7 (S.D. Ohio Aug. 11, 2015). Moreover, "this, in and of itself, satisfies the prejudice standard." *Id.*

Defendants nevertheless argue that because VTL has denied liability in this matter "from day one" and has not made a settlement offer based upon its insurance coverage or otherwise, VTL "did not seek and did not obtain . . . any tactical advantage from its error" and, therefore, Plaintiffs were not prejudiced. (ECF No. 81, at pg. 2, 11.) Furthermore, Defendants argue that "because VTL's insurer has been placed on notice of the claim, Plaintiffs would not/could not suffer any prejudice arising from late notice to the excess insurer of such a claim." (*Id.* at pg. 12.) Defendants' arguments fall short. Plaintiffs have been required to spend an excessive amount of time, money, and effort to obtain this insurance policy from Defendants, and "this, in and of itself, satisfies the prejudice standard." *Brown*, 2015 WL 4742686 at *7. If Defendants' argument that they did not "obtain . . . any tactical advantage" sufficed, in any case where a party gains no obvious advantage from a lengthy delay in producing discovery then the party put on wait for the materials would always lose out.[8]

Defendants argue the Court should look to *Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015) to aid in determining whether sanctions are appropriate. (ECF No. 81, at pg. 12–13.) In

---

[8] It is possible in theory that a party *is seeking* "to obtain a tactical advantage" by delaying discovery, but when no obvious advantage plays out they can claim the other party was not prejudiced. It is not enough, therefore, to rely on obscure "advantages," but instead a court must look to the measurable damage done to the other party, such as having to expend time, money, and effort. *Brown*, 2015 WL 4742686 at *7.

that case, the United States Court of Appeals for the Sixth Circuit adopted a five-factor test developed by the United States Court of Appeals for the Fourth Circuit in *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385 (4th Cir. 2014). That test involves five factors for a court to consider in determining whether an omitted or late disclosure is "substantially justified" or "harmless." *Howe*, 801 F.3d at 748. The court in *Howe* found that plaintiff's late disclosure, which occurred during discovery prior to a retrial, was harmless, noting that it was "more likely the result of negligence, confusion, and lack of information than underhanded gamesmanship." *Id.* at 749. Defendants cite to this sentence (ECF No. 81, at pg. 12), but fail to include important clarifying language which begins in the next sentence:

> Our review of the record suggests that the discovery period before the retrial was a rushed, confusing nightmare. . . . The record further reveals that the *attorneys for both sides engaged in a childish withholding game, rather than providing necessary information* to determine how best to make the Plaintiffs whole."

*Howe*, 801 F.3d at 749–50. This set of facts differs markedly from those at hand in the instant case. Neither Defendants nor the Court accuse Plaintiffs here of engaging in any "childish" games while they waited for the Defendants to produce the Lloyd's of London policy. Of course, if both sides had engaged in underhanded tactics, the calculus for the Court in determining whether sanctions are appropriate would differ.

Defendants also rely on *Prime Finish, LLC v. ITW Deltar IPAC*, 608 F. App'x 310 (6th Cir. 2015) as support for their assertion that sanctions should not be imposed on them. (ECF No. 81, at pg. 9.) In a parenthetical, Defendants include the following sentence from the case: "On the facts before us, there is no suggestion of any contumacious conduct, no clear record of delay, and no intent—deliberate or reckless—to thwart ongoing judicial proceedings." *Prime*, 608 F. App'x at 314. Again, Defendants fail to include important clarifying language in the next sentence: "The facts suggest only the negligent failure of replacement counsel to give his new

client's case the care and attention it deserved." *Id.* In the instant case, the Court cannot construe that what occurred amounts to anything close to the simple "negligent failure of replacement counsel to give his new client's case the care and attention it deserved." Rather, Defendants, at every turn, failed to take even the most basic steps to confirm or deny whether an excess insurance policy existed. For instance, Mr. Burn and Ms. Bourbeau appear to have tried their best to remain ignorant of whether any such policy existed. When one was found to have existed—and that a claim for the Mosley crash had been made on that very insurance policy— each pointed fingers and claimed it was not his or her responsibility to know this information. Mr. Burn claimed multiple times at the hearing on the Motion that it was only Ms. Bourbeau, not him, who was responsible for insurance information.[9] Ms. Bourbeau claimed she relied on the insurance brokers and did not bother to clarify information herself, despite being held out as VTL's corporate representative for insurance matters. (*See generally* Bourbeau Depo.) And Defendants then finally lay the blame on Ms. Carbonneau who supposedly had the "full authority" and "specific consent of VTL" to place the excess insurance policy company on notice of the Mosley Crash, yet no one bothered to contact her even in the face of a Court Order to inquire further. All the while, VTL remained ignorant of the fact that the excess insurance policy even existed. (ECF No. 81, at pg. 3; ECF No. 81, Exhibit 4, at ¶ 19.)

"[T]he most fundamental responsibility of those engaged in discovery . . . is to provide honest, truthful answers in the first place and to supplement or correct a previous disclosure when a party learns that its earlier disclosure was incomplete or incorrect." *Brown*, 2014 WL 2987051 at *17 (internal quotations and citation omitted). Furthermore, "[t]he discovery process

---

[9] This assertion is contrary to Ms. Bourbeau's testimony in her deposition, which was that *both* she and Mr. Burn are involved in the purchase and procurement of insurance. (Full Bourbeau Depo., at pg. 9.)

created by the Federal Rules of Civil Procedure is premised on the belief or, to be more accurate, requirement that parties who engage in it will truthfully answer their opponents' discovery requests and consistently correct and supplement their initial responses." *Id.* at *17 (citing *Lebron v. Powell*, 217 F.R.D. 72, 78 (D.D.C. 2003)). Defendants failed in this regard. Defendants violated Federal Rule of Civil Procedure Rule 37(b)(2) by failing to produce the excess insurance policy after a diligent inquiry as ordered by the Court in its December 1, 2017 Order. Defendants violated Federal Rule of Civil Procedure 37(c) by failing to disclose the insurance information, and by failing to supplement its discovery responses. Indeed, it was not until *after* the instant Motion was filed that Defendants finally provided Plaintiffs with a copy of the Lloyds of London policy, despite the fact that almost one month had passed since Plaintiffs notified Defendants about the policy. Defendants violated multiple provisions of Federal Rule of Civil Procedure 26 which requires disclosures be made thirty days after a later-joined defendant is added to an action, specifically requires a party to provide "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action[,]" and requires that disclosures to be supplemented "in a timely manner." Fed. R. Civ. P. 26(a)(1)(D), 26(a)(1)(A)(iv), & 26(e)(1)(A).

Despite all of the above, Defendants argue that Plaintiffs' Motion should be denied because Plaintiffs have failed to comply with Federal Rules of Civil Procedure Rule 37 and Southern District of Ohio Local Civil Rule 37.1 regarding "meeting and conferring" with the opposing party prior to filing a Motion. (ECF No. 81, at pg. 13.) Plaintiffs respond that their Motion for Sanctions

> was pursuant to Federal Rules of Civil Procedure 37(b)(2) and 37(c) and was not a motion for an order compelling disclosure or discovery pursuant to Federal Rule of Civil Procedure 37(a). . . . While Rule of Civil Procedure 37(a) requires a certification that the movant attempted to confer Rules 37(b)(2) and 37(c) do not.

(ECF No. 82, at pg. 7.)  Plaintiffs then cite to *E.E.O.C. v. JP Morgan Chase Bank, N.A.*, 295

F.R.D. 166, 170–71 (S.D. Ohio 2013) which provides in pertinent part:

> Defendant also argues that this Court should not consider the motion for sanctions because Plaintiff has failed to follow prerequisite procedures mandated by the Federal Rules of Civil Procedure and the Local Civil Rules.  Defendant's premise is that because Plaintiff did not confer with Defendant on the substance of the motion for sanctions, Plaintiff has violated Federal Rule of Civil Procedure 37(d)(1)(B) and S.D. Ohio Civ. R. 37.1.

> The Federal Rule provides that "[a] motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action."  Fed. R. Civ. P. 37(d)(1)(B).  The Local Civil Rule in turn provides that

>> Objections, motions, applications, and requests relating to discovery shall not be filed in this Court, under any provision in Fed. R. Civ. P. 26 or 37 unless counsel have first exhausted among themselves all extrajudicial means for resolving the differences.  After extrajudicial means for the resolution of differences about discovery have been exhausted, then in lieu of immediately filing a motion under Rules 26 and 37, Fed. R. Civ. P. and S. D. Ohio Civ. R. 37.2, any party may first seek an informal telephone conference with the judicial officer assigned to supervise discovery in the case.

> S.D. Ohio Civ. Rule 37.1.  Local Rule 37.1 references Local Rule 37.2, which in turn provides:

>> To the extent that extrajudicial means of resolution of differences have not disposed of the matter, parties seeking discovery or a protective order may then move for a protective order or a motion to compel discovery pursuant to Fed. R. Civ. P. 26(c) or 37(a).  Such motion shall be accompanied by a supporting memorandum and by a certification of counsel setting forth the extrajudicial means which have been attempted to resolve differences.  Only those specific portions of the discovery documents reasonably necessary to a resolution of the motion shall be included as an attachment to it.

> S.D. Ohio Civ. R. 37.2.

> On its face, Local Rule 37.1 thus contemplates one mandated step: that the parties exhaust among themselves all extrajudicial means for resolving any discovery dispute before filing any Rule 26 or 37 motion.  Local Rule 37.1 then contemplates one discretionary step: that if the inter-party discussions have failed, either party *may but is not required* to request an informal telephone conference before filing a

motion.  Once extrajudicial means have failed, Local Rule 37.2 permits a party seeking or opposing discovery to file a motion with a supporting memorandum and certification.  As Plaintiff correctly points out, Defendant's reliance on these rules is a red herring.  Neither the Federal Rules of Civil Procedure nor the Local Civil Rules require the filing of a certification here.

Plaintiff's failure to comply with the certification requirement of Rule 37(d)(1)(B) does not matter here because the requirement is inapplicable to Plaintiff's motion for sanctions.  Rule 37(d)(1)(B) applies only to a motion for sanctions for failing to answer or respond under Rule 37(d)(1)(A).  Plaintiff originally filed its motion for sanctions under Rule 37(b) (failure to comply with a court order) and Rule 37(c) (failure to disclose, to supplement an earlier response, or to admit) . . . . Plaintiff is pursuing sanctions under a part of Rule 37 to which Rule 37(d)(1)(B) does not apply.

Local Rule 37.1 also does not provide Defendant protection from the merits of the motion for sanctions.  There is no question that the motion for sanctions is a motion related to discovery filed under a provision of Rule 37.  But there is equally no question that the parties' prior dealings indicate that no extrajudicial means exist for resolving the dispute that lies at the heart of the motion for sanctions. . . . This exhaustion is enough to satisfy the rule here, regardless of whether the exhaustion has been memorialized in a certification.

Local Rule 37.1 does not itself impose a certification requirement; rather, the local rule mandates only that the parties exhaust extrajudicial means.  Local Rule 37.2 does contain a certification of exhaustion requirement, but only in regard to the filing of a motion to compel or a motion for a protective order.  The plain[] text of Local Rule 37.2 makes its inapplicability here obvious in two ways, just as it did in *May v. Pilot Travel Centers LLC*, No. 2:05-cv-918, 2006 WL 3827511 (S.D. Ohio Dec. 28, 2006).  The same reasons that this Court identified in *May* apply here:

> First, Plaintiff is not "seeking discovery or a protective order" as Local Rule 37.2 contemplates; rather, Plaintiff is seeking the imposition of sanctions. Second, the local rule contemplates only motions filed specifically pursuant to Federal Rules of Civil Procedure 26(c) or 37(a), not a motion under Rule 37(c).

> *Id.* at *3.  Thus, Local Rule 37.2 is inapplicable to Plaintiff's motion under Rule 37(c), and to the extent Defendant seeks to apply the rule in this context, Defendant errs.

*Id.*  Accordingly, Defendants' argument fails, given the bases upon which Plaintiffs rely in their Motion for Sanctions.  Furthermore, Defendants claim that Plaintiffs' failure to discuss the issue with them is limited to the span of time between when Plaintiffs alerted Defendants about the

Lloyd's of London policy (April 9, 2018) and when Plaintiffs' filed their Motion (May 8, 2018). (ECF No. 81, at pg. 6; ECF No. 81, Exhibit 2, Belzer Aff., at ¶ 19.)  This assertion, however, ignores all of the instances in which Plaintiffs specifically sought information on an excess insurance policy before the Lloyd's of London policy was discovered.  (*See e.g.*, ECF No. 77, Exhibits 1, 5, & 6.)  Defendants' argument that Plaintiffs' Motion should be denied because Plaintiffs have failed to comply with Federal Rules of Civil Procedure Rule 37 and Southern District of Ohio Local Civil Rule 37.1 fails to persuade.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Sanctions is **GRANTED**.  (ECF No. 77.)  Under the provisions of Rule 37(b)(2)(A) and (C), Defendants are **ORDERED** to pay the reasonable expenses, including attorney's fees, caused by Defendants' failure to obey a discovery order.  The Court **AWARDS** Plaintiffs' reasonable attorney's fees and costs associated with bringing this Motion and the additional efforts Plaintiffs' counsel had to expend to obtain the Lloyds of London insurance policy from Defendants.  The monetary sanctions will be in an amount to be decided post judgment.  The Court encourages the parties to reach an agreement concerning the appropriate amount to be awarded.  In the event the parties cannot reach such an agreement, Plaintiffs shall file a supplemental memorandum within **FOURTEEN (14) DAYS** after termination of the above-captioned case in support of the awarded fees and expenses, setting forth information that would permit the Court to assess the reasonableness of the amount requested, including the timekeeper, rate, and explanation of work, to the extent counsel may do so without violating the attorney-client privilege.[10]

---

[10] The Court notes that, at the evidentiary hearing on the Motion, Plaintiffs specifically reserved the right for an additional hearing on the matter of monetary sanctions.  Accordingly, if Plaintiffs request another hearing, they will do so in the supplemental memorandum.

**IT IS SO ORDERED.**

**Date: March 27, 2019**                    */s/ Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **CHIEF UNITED STATES MAGISTRATE JUDGE**